D. Roger Englar and Ethel M. Englar v. Commissioner. T. Catesby Jones and Louisa Brooke Jones v. Commissioner. Oscar R. Houston v. Commissioner. George S. Brengle v. Commissioner. Paul H. Lacques v. Commissioner.
Englar v. Commissioner
Docket Nos. 7564, 7565, 7566, 7567, 7568.
United States Tax Court
1947 Tax Ct. Memo LEXIS 344; 6 T.C.M. (CCH) 825; T.C.M. (RIA) 47197; 1947
*344 Petitioners' law firm, under one retainer to recover clients' war claims on basis of contingent fee for all services of 15 per cent of all recoveries, rendered services from 1918 to 1931 in proving claims, securing awards, and securing partial payments up to the end of 1931 and rendered services from 1932 to 1941 securing additional partial payments made in 1941. The fees received on recoveries prior to the end of 1931 exceeded the fees received in 1941 on that year's recoveries. Held, that the services in the two periods are inseparable; also, that the fees received in 1941 were compensation for services rendered prior to 1932 as well as subsequent thereto and indivisible as between those two periods. Held, further, that petitioners are not entitled to the benefits of section 107, I.R.C.
J. Joseph Noble, Esq., 99 John St., New York 7, N. Y., for the petitioners. Clay C. Holmes, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion These proceedings, which have been consolidated, involve income tax deficiencies for the calendar year 1941, determined by respondent against the petitioners, respectively, in the following amounts (all of which are not in *345 controversy, except in the case of the last named petitioner): Docket
Nos.
7564
D. Roger and Ethel M. Englar $8,465.12
7565
T. Catesby and Louisa Brooke
Jones
6,153.71
7566
Oscar R. Houston
3,562.90
7567
George S. Brengle
890.14
7568
Paul H. Lacques
1,359.21
The error assigned in each proceeding is that respondent included in petitioner's net income for 1941 and taxed at 1941 rates, his share of income from certain legal fees (less a small amount not in controversy) and thus erroneously failed to apply the benefits of section 107, I.R.C., as amended, in computing the tax liability of petitioner on such income. In Docket Nos. 7564, 7565, 7566, and 7567 no issues have been raised as to other adjustments made by respondent. In Docket No. 7568 no adjustments were made by respondent other than those in controversy. The proceedings have been submitted on a stipulation of facts, documentary evidence, and oral testimony. The stipulation is adopted as a part of our findings of fact and included herein by reference. Only such of the stipulated facts as are necessary to consideration of the issue presented are set out herein. Findings of Fact 1. The petitioners, D. Roger *346 Englar, T. Catesby Jones, Oscar R. Houston, George S. Brengle, and Paul H. Lacques, are attorneys at law and members of the law partnership of Bigham, Englar, Jones & Houston, whose offices are at No. 99 John Street, New York, New York. Petitioner, Ethel M. Englar, is the wife of D. Roger Englar, and the petitioner, Louisa Brooke Jones, is the wife of T. Catesby Jones. All petitioners are residents of New York and duly filed their returns for the year 1941 with the collector of internal revenue for the second district of New York. The five petitioners first above named in this paragraph will hereinafter be referred to as petitioner, or petitioners. 2. During the period from 1918 to 1923, the petitioners' law partnership was consulted and retained by different insurance corporations and other clients, most of which had underwritten marine and war insurance risks on vessels and cargoes during World War I. These retainers were received in connection with proceedings for effecting recoveries from Germany on account of losses sustained by clients mostly under marine and war risk insurance policies due to the loss of or damage to vessels and cargo through enemy submarine action and the *347 action of mines and armed raiders during World War I. 3. The first written retainers received by petitioners' firm from these clients were in the form of letters and other writings, dated in the latter part of 1921, which provided for reimbursement to petitioners' firm of out-of-pocket disbursements incurred, regardless of the result accomplished and, in addition, compensation contingent on the recoveries made, to the extent of 15 per cent of the actual recoveries. In July and August 1924, after the amounts of the awards on proven claims had been agreed upon by agents of the United States and Germany in the proceedings before the Mixed Claims Commission, the petitioners' firm and its clients exchanged letters and other writings which set forth a plan for the payment of expenses by the clients who won awards and confirmed the petitioners' contingent fee of 15 per cent of the amount actually recovered for the various clients, respectively. 4. Claim for losses of ships and cargo filed for clients of petitioners' firm, principally marine and war risk insurance underwriters, were classified as follows: TOTAL LOSSES
By Submarine action (torpedoed)
313 ships
By Armed raiders
30 ships
By Exploding mines
37 ships
By Mines or torpedoes (cause undeter-
mined)
3 ships
By Gunfire
1 ships
PARTIAL LOSSES
By Submarine action (torpedoed)
27 ships
By Mines
16 ships
*348 The claims were ultimately adjudicated by the Mixed Claims Commission and the proof thereof given by official representatives of the United States Government, because the parties to the proceedings were the Governments of the United States and Germany. Neither petitioners' firm nor their clients were parties to these proceedings and did not, and could not, participate in them directly. 5. Beginning in December 1918 petitioners' firm performed a considerable amount of professional services under their retainers, including the preparation and filing of particulars of clients' claims with the United States Department of State, collecting, analyzing and tabulating data on the claims, studying the history and legal precedents for adjudication before the Mixed Claims Commission and similar international proceedings, keeping in touch with the proceedings before the Mixed Claims Commission and the United States Treasury Department, preparing and submitting briefs and memoranda to the United States representatives before the Commission, and otherwise supplying the United States representatives and other officials responsible for the conduct of the hearings before the Mixed Claims Commission *349 with such assistance, information, and memoranda as they required from time to time, and serving as a channel of communication between clients and the various official bodies concerned. Petitioners' firm rendered similar services to each such client with respect to its war claims, regardless of the amount of the claim. 6. In September 1924 the Mixed Claims Commission made awards of damages to American claimants whose claims were proven to be the result of enemy action during World War I (referred to hereinafter as "proven claims"). Prior to the end of the year 1931 about 40 clients of petitioners' firm (each of which had an award of $100,000, or less) had been paid their awards in full, totaling approximately $4,000,000, and the remaining clients of petitioners' firm, about 30 in number (each of which had an award for more than $100,000) received partial payments, totaling approximately $21,000,000 on account of their awards. The petitioners' firm received as fees 15 per cent of those payments made to clients. 7. Payments made prior to the end of 1931 to American claimants with proven claims exhausted all assets then available for the payment of awards by the Mixed Claims Commission, *350 except that a fund had been set aside by the United States Treasury Department as a reserve fund out of which to pay possible awards on claims which had been filed with the Mixed Claims Commission, but which had not yet been finally adjudicated (hereinafter referred to as the "unproven claims"). These unproven claims involved, among others, the so-called "sabotage" claims including the losses of property resulting from the Black Tom and Kingsland Explosions. 8. In 1932 the German Government ceased making payments on account of reparations. There were then available no funds with which to pay clients of petitioners' firm the unpaid balances of their awards. 9. Subsequent to the receipt of the payments made prior to the end of 1931, referred to in paragraph 6 above, and continuing up to and including the year 1941, petitioners' firm, among others, was engaged in negotiations with representatives of the United States Government in Washington, D.C., and in Germany, on behalf of the clients who had not received payments of their awards in full. These negotiations were directed to the making available of further sums of money from the reserve fund set aside by the United States Treasury *351 Department for "unproven claims." Petitioners' firm conducted negotiations with representatives of the German Government and, in this connection, a representative of petitioners' firm travelled from the United States to Germany and back on three separate occasions; said representative, among others, successfully opposed a plan entered into by certain representatives of the German Government with representatives of the holders of unproven claims whereby those claimants would have received the funds earmarked by the United States Treasury Department for the payment of unproven claims without requiring such holders to produce further proof that the damages were caused by German action; and conducted further conferences and negotiations which resulted in the formulation and adoption of a plan whereby clients of petitioners' firm received further payments on account of their awards from the fund set aside by the United States Treasury Department for "unproven" claims. 10. The payment of all the funds set aside for the "unproven" claims on those claims would have left no further funds out of which payments could be made to petitioners' clients. 11. In 1941 additional partial payments *352 were made to the 30 clients of petitioners' firm who had not received the full amounts of their awards prior to the end of the year 1931, as set forth in paragraph 6 above, and to one additional client which retained petitioners' firm subsequent to the end of 1931, and petitioners' firm received 15 per cent of such amounts as additional fees, which amounted in the year 1941 to the sum of $157,663.75, and which included a fee of $10,000, received from the one new client, as above mentioned. Each petitioner's share of the aforesaid fees totaling $157,663.75 was as follows: D. Roger Englar and Ethel M. Englar
$32,668.98
T. Catesby Jones and Louisia Brooke
Jones
26,345.96
Oscar R. Houston
20,022.93
George S. Brengle
4,581.91
Paul H. Lacques
6,684.58
12. The compensation received by petitioners' firm up to and including the end of 1931 on account of payments made on the above mentioned 30 clients' awards (15 per cent of $21,000,000) exceeded the sum of $157,663.75, the amount received in 1941. 13. The services rendered by petitioners' firm on its clients' war claims during the period from 1918 to 1931 were performed primarily in this country under the supervision of the *353 firm members Henry J. Bigham and Oscar R. Houston, while its services rendered during the period from 1932 to 1941 were performed in this country and Germany under the supervision of the firm member Paul Lacques, but all such services were performed under the original written retainers mentioned in paragraph 3 hereof (with the exception of the one new client) and on the specified compensation basis of a contingent fee of 15 per cent of the actual recoveries. The firm's services rendered during 1918 to 1931 pertained to the proof of the war claims, the securing of awards by the Mixed Claims Commission and the recoveries to the extent payments were made to its clients, including about 40 whose awards of $100,000 or less were paid in full prior to the end of 1931 and about 30 whose awards exceeding $100,000 were partially paid prior to the end of 1931. The firm's services rendered during 1932 to 1941, with the exception of the one new client obtained in that period, pertained to the securing of further payments on the prior awards of those original 30 clients who had not been paid in full by the end of 1931, but the services performed by the firm prior to 1931 on the claims culminating *354 in those awards were a prerequisite to the securing of the additional recoveries thereon in 1941. 14. During 1932 up to, but not including 1941, the clients of petitioners' firm received no payments on account of their war claim awards and the firm received no fees for the services performed during that period to secure additional recoveries because its fees were contingent upon actual recoveries. On the recoveries made in 1941, petitioners' firm received fees totaling $157,663.75 as set forth in paragraph 11 hereof, of which $10,000 was from the one new client and the balance was from the 30 old clients pursuant to the original written retainers as set forth in paragraph 3 hereof. The full amounts of the awards to the 30 clients have not yet been paid. In determining each petitioner's tax liability for the year 1941, the respondent applied the provisions of section 107, I.R.C. to their respective shares of the $10,000 fee as to which there is no controversy, but denied the application of that section to the remaining fees of $147,663.75 and included in 1941 income, taxable at 1941 rates, the entire amount of their respective shares thereof. 15. The fees received by petitioners' *355 firm in 1941 totaling $147,663.75 on the basis of 15 per cent of the partial recoveries in that year by the 30 old clients on their 1924 war claim awards, each of which exceeded $100,000, constituted compensation for services rendered under contracts entered into in 1921 and 1924 and, further, constituted compensation for services prior to 1931 in connection with proving the claims and securing those awards, as well as compensation for its services subsequent to 1932 in securing additional recoveries on such awards by those clients in 1941. The fees so received by the firm in 1941 were for services covering a period in excess of five years, but constituted less than 75 per cent of the total compensation received by it, under its original retainer contracts for services rendered in obtaining payment of war claims of the 30 clients. Opinion TYSON, Judge: In determining each petitioner's 1941 income tax liability the respondent has included in income and taxed at the 1941 rates, the amount of each petitioner's share (less a small exception not in controversy) of certain of his law firm's fees received in 1941, based on a percentage of partial recoveries in that year on war claims of *356 30 clients, but constituting compensation for services rendered such clients in 1941 and over a period of prior years. The question presented is whether each such share of income should be taxed in 1941 at no greater amount than the aggregate of the taxes attributable thereto had it been included in gross income ratably over the period of years preceding the receipt thereof, under the benefits prescribed by section 107, I.R.C. That section of the Code as amended by section 139 of the Revenue Act of 1942 and made applicable to the calendar year 1941, is set out in the margin. [1]
*357 There is no question but that the legal fees in controversy constituted compensation for personal services of such petitioners, as members of their law firm, covering a period in excess of 60 calendar months, within the meaning of section 107, supra. The controversy herein hinges on whether the amount of the fees received in 1941 constituted at least 75 per cent of the total compensation for the services rendered, as required by that section. The petitioners do not dispute the fact that, except as to the $10,000 fee from one new client obtained subsequent to 1932, the fees received in 1941 from the 30 clients were paid pursuant to the original written retainers entered into in 1921 and 1924, but they contend that the fees received in 1941 constituted compensation solely for services rendered from 1932 to 1941, inclusive, and that therefore they represented 100 per cent compensation for services begun and completed within such period of years without any relation to the services rendered to the same clients from 1918 to 1931. The respondent contends that the law firm's services as to the 30 clients rendered prior and subsequent to 1932 are inseparable and that, in applying *358 section 107, supra, the fees received prior to the end of 1931 and those received in 1941 must be taken together in computing the total compensation received and the percentage thereof received in the taxable year 1941. Thus, the parties present the question of whether the firm's services rendered during the period from 1932 to 1941 are separable from those rendered during the period from 1918 to 1931. In Smart v. Commissioner, 152 Fed. (2d) 333; certiorari denied, 327 U.S. 804; affirming 4 T.C. 846, the taxpayer received, in the taxable year 1941, trustees' commissions of two kinds, one for looking after the trust corpus from the time the trust was set up in May 1933 up to October 1940 and the other for collecting income of the trust from 1937 to October 1940. Prior to 1941 he had received commissions for collecting income for years prior to 1937. The 1941 commissions on corpus were less than the sum of the commissions on income for the two periods, so that the benefits of section 107, supra, would not apply to the 1941 commissions on corpus if both the commission on corpus and on income *359 were treated as paid for a single set of services. The Court said that, "* * * the case turns upon whether the services for which the capital commissions were awarded were separable from those for which the income commissions were awarded". The Court found that both services were so inter-related as to be inseparable; and it held that the commissions on both corpus and income "should be brought into a hotchpot and the prescribed percentage computed accordingly" with the result that the taxpayer was denied the benefits of section 107, supra. See also Civiletti v. Commissioner. ( 1945), 152 Fed. (2d) 332; affirming 3 T.C. 1274; certiorari denied, 327 U.S. 804. The facts in the Smart case, supra, are not on all fours with those herein, but the principle there applied is applicable here. In the instant case not only are the services during the two periods, from 1918 to 1931 and from 1932 to 1941, inseparable, but also the fees received in 1941 are so inter-related to the services rendered prior to 1932 as to, in part, constitute payment for services rendered prior to the end of 1931. The *360 fees received in 1941 and the fees received prior to the end of 1931 are indivisible as between those two periods, and section 107, supra, is therefore inapplicable. The original retainers of petitioners' law firm provided for contingent fees based on actual recoveries by each of its clients on their respective war claims. If there were no recoveries then the firm was due no fees irrespective of the amount or length of services rendered, but, on the other hand, when recoveries were made, and not until then, the firm was due fees in the amount of 15 per cent thereof irrespective of when the payments were made, whether prior to 1932, or in 1941, or in some other year. As to 30 of its original clients, the firm rendered services during the years 1918 to 1931, inclusive, in connection with the proof of their claims, the securing of awards thereon, and the recovery of partial payments on such awards and, also, in continuation of the service for which originally retained, it thereafter rendered services during the years 1932 to 1941, inclusive, in connection with recovery of further partial payments on those same awards. The firm received fees of 15 per cent of all recoveries, both *361 prior to 1932 and in 1941. However, such fees are not divisible between those two periods of recoveries, for the securing of the awards prior to 1931 [1932] was a prerequisite to securing the additional recoveries in 1941 and the fees received in 1941 constituted compensation for the firm's services prior to 1931 in securing those awards as well as compensation for its services subsequent to 1931 in securing the 1941 additional recoveries on such awards. In short, the firm's 1941 fees embraced payment for its services rendered to those 30 clients from 1918 to 1931 and were not, as contended by petitioners, 100 per cent compensation solely for an entirely separate and unrelated character of services initiated in 1932 and completed in 1941. Eliminating consideration of the fact which we consider as immaterial herein, that the undertaking of petitioners' firm for recovery of the claims of its 30 clients had not been completed in full in 1941, we conclude that the firm's services rendered to the 30 clients during 1918 to 1931 and 1932 to 1941 were so inter-related as to be inseparable and that its fees received prior to 1932 and in 1941 were compensation for a single set of services *362 pursuant to one continuing contract of retainer under which it was to render one ultimate service of securing the payment of those clients' war claims and was to receive for all services rendered only one fee amounting to 15 per cent of the actual recoveries. The firm's fees received from those 30 clients on recoveries prior to the end of 1931 exceeded its fees received in 1941 on recoveries in that year and, in view of our above conclusion, the latter amount of fees constituted less than the statutory percentage of 75 per cent of the total compensation for such services. We hold that petitioners are not entitled to the benefits of section 107, supra; Smart v. Commissioner, supra;J. Mackay Spears, 7 T.C. 1271; and Julia C. Nast, 7 T.C. 432. The respondent did not err in his determination. Decision will be entered for the respondent. Footnotes
1. SEC. 139. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE. (a) Section 107 is amended to read as follows: "SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE. "(a) Personal Services. - If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual." * * *
(b) The amendment made by subsection (a) shall be applicable to taxable years beginning after December 31, 1940, but with respect to a taxable year beginning after December 31, 1940, and not beginning after December 31, 1941, the period specified in such subsection shall be sixty months in lieu of thirty-six months, and the percentage specified in such subsection shall be 75 per centum in lieu of 80 per centum.↩